May it please the court. My name is Louis Ricciardi and I represent Glenn and Donna Gates, the appellants before this court and the plaintiffs below. With the court's permission, I would like to reserve three minutes for rebuttal. All right. Your Honor, the Gates are residents of a small town in Illinois, McComb Lake Village. The town is surrounded largely by farmland and is about a mile to a mile and a half away from a chemical plant operated by the defendants. During the course of the operations of the chemical plant, the defendants contaminated the groundwater. That groundwater contamination has been migrating off their property for decades at this point. Recently, in 2005 and 2006, several residents of McComb Lake Village came down with malignant brain cancer, very rare cancer, including three residents who lived side by side and directly across the street from the farmland adjacent to the plant. Those three residents brought claims in the Philadelphia Court of Common Pleas. The Gateses do not have cancer. They brought claims in the district court seeking certification of two classes, a class of residents like themselves who are exposed and are at risk for developing brain cancer in the future, a class seeking medical monitoring relief, and a class of homeowners such as themselves whose property has been affected by the contamination. Counselor, what issue that is common to all is susceptible of common proof here? Do you have to show that the common issues predominate? How can you show that? I understand, Your Honor. Let me take each class and give you the elements of each one that are common. In the medical monitoring context, as the district court found, I think there are seven elements of a medical monitoring claim set out in the Redlands case under Pennsylvania law. The district court found that I think four of them on their face presented common issues of fact. Three did not. And three did not. The three were the element of exposure above background. Isn't that pretty important here, and isn't that really an individualized issue that you're going to have to go person by person by person as to when were they exposed, how were they exposed, what duration, et cetera? The answer for each person is individual. The answer as to what level of exposure that person received is an individual answer. The question and the evidence in support of those answers are common, a common question and a common answer. But you never had a – there was never any evidence of a minimal exposure, was there? There was evidence of a minimal exposure. The court – Both the danger point and the minimal amount of exposure that might create a problem above the background level? Yes. The minimum, the danger point, to use the parlance from the court below and our briefs, the danger point is .07 micrograms per meter. The danger point is established by the expert testimony of our toxicologist. Judge Prater had problems with both of your experts, with Zanetti and with Ginsburg. Why don't you tell us where she erred in that? She erred in two ways with regard to airborne exposure. The first was in misapplying Dr. Ginsburg's testimony to the issue of exposure above background, and the second was in misapplying Dr. Zanetti's testimony, which went to exposure above background as a collection of averages as opposed to exposure per person. With respect to Dr. Ginsburg, the court, in its opinion, that Dr. Ginsburg applied a .127 micrograms per cubic meter average to the entire class. He did that not in the context of calculating each person's exposure, but in the context of doing a class-wide risk assessment, which was one part of a multi-factor test that he applied in opining on the necessity for medical monitoring to the members of the class, which is element seven. It doesn't go to evidence of exposure above background. It doesn't go to evidence of the danger point. That is a figure of exposure that varies from place to place within the village, right? And the extent of the exposure varies for periods of time between the people living there because of how long they might live there. So how can that be a common factor? As the evidence to prove it is common in the sense that there's a computer model that generates, that tracks the exposure from the plant to the village, and the computer model generates a, basically lays a grid over the village, and for every point when that grid calculates an exposure at that point, and then the computer generates a series of lines that demarcate levels of exposure across an area. But it's not all 1.7 or 1.27. No, actually the 1.27 number has, to overly simplify things, has no relation to exposure above background. Respectfully, the district court got it completely wrong. And we laid out in our post-certification briefings under the headings for each element of the medical monitoring claim what evidence we were relying on for that claim. And nowhere did we suggest that Dr. Ginsburg's analysis was the analysis that would provide evidence above background for any class member. But if I'm a college student living there, but I'm away at college nine months of the year, and then I have a summer job in New York, and you're putting me in this class that needs medical monitoring, don't you really have to assess individually whether I have been exposed in such a way that I do need medical monitoring, and whether it's reasonably necessary? I mean, you said before, you said the proof is common, but the answer is individual. I don't know how you have a common proof and then come up with different answers, unless the answers are answers to an individualized inquiry. The inquiry would be, the individualized inquiry would be, was this person exposed to the particular chemical at issue at an average concentration over the course of a year? How do you figure out that person's average concentration? Through the use of Dr. Zanetti's isoplasts. Now there's going to be variation in individual exposure because people walk in and out of the community every day on their way to work. Some people may have gone to school and so forth. The class was defined as a year of exposure to accommodate that variation, so that it's possible to conceive of someone who would be a resident under some definition of the term resident, but not present for the year. It's possible. Following up on those questions then, what does the trial of this case look like? The trial of the case looks very similar to the class certification hearing with the exception of live testimony. Dr. Zanetti would provide a testimony as to the exposure over time. And if we were permitted to go back, we would be more. I want to find out how you get each individual plugged in here. What happens? Assuming causation can be established. Well, I'm jumping ahead. Eventually you've got to get causation for each individual, and you've got to get damages for each individual. And as my colleagues have asked, why aren't these individual issues? I mean, it seems to me that it would be almost impossible to try this case. I disagree, and let me try to lay out for you how that would work. And before I do that, as my time is getting short. We'll give you a few more minutes. The property class, we asked for bifurcation and certification of common issues, which would mean that their answer would be different for the property class as to how to approach it. I understand. As to the medical monitoring class, we need to prove exposure. Let's just take exposure above background for all members of the class. Class is defined as everybody who was resident in McComb Lake Village for one year during various years in question. At trial, Dr. Zanetti would testify. So it's not the same year. It's different years with different levels of exposure? That's correct. At trial, Dr. Zanetti would testify as to the range of exposures over time at different points in the village. Very specifically, there would be a line drawn, and within the line would be exposure above a level, and outside the line would be exposure below a level. And these lines can be drawn year by year if need be. They weren't at the class certification stage, which I think is a different issue of proof as to whether we can draw these lines as opposed to how specific we need to draw them at trial. But a year-by-year analysis of what percentage of the village is covered by exposure above a danger point above background. For each year, everyone in that class is either exposed or not exposed. It's also possible that the jury could find some years that there was exposure and some years that there wasn't sufficient exposure, depending on what the model shows. Or the model could split the class, and then the jury would have to make a more specific finding as to the portion of the class that was entitled to relief or not. Isn't there, even assuming it were possible to do this, would this not prejudice those who might have a very high exposure? If you can prove that. There's two answers that I would give to that. It would not prejudice people who have a high exposure because the same model is calculating all the exposures. If their exposures come out as high exposures because they lived closer to the plant, the proof of their high exposures is done by the same model and the same expert. And so, therefore, they're not prejudiced. The second point is they are prejudiced if we're not permitted to do this on a class-wide basis because then they're done. Then they have no case. And I know that that's not a basis for certification, but it's certainly a consideration. An individual case in which they would have to hire eight or nine experts to recover property damage where the homes are worth, at most, a couple hundred thousand dollars. Well, there are already 30 cases pending, aren't there? And each of them either is a plaintiff who has died or has a relative who has died of brain cancer and has a claim for personal injuries and cancer-death-related claims. That's a completely separate issue. But, I mean, there are experts out there ready to opine on this. There are. Absolutely. I'm just saying as a financial matter and as a practical matter, to bring a claim that requires a series of expert testimony to produce the factual basis for the claim wouldn't be practical. I see my time has elapsed. May I address the property class very briefly? Yes. Can I ask one more question about the medical monitoring? The brain scans have a great deal of peril, risk in and of themselves. And I am somewhat surprised, and I gather that they aren't all that predictive of brain tumors anyway. Aren't the plaintiffs going to be, if they should prevail, aren't they going to be subjected to a very risky procedure that may not produce any results that would benefit them? A couple of follow-ups. No one would be forced to have an MRI or other procedure. They would be entitled to by virtue of the case. They're not giving up any rights if we prevail and establish their right to an MRI. They would still have the ability to consult with their physician and decide whether to go forward. The second point would be that it's actually the opposite concern that Your Honor raises that the defendants have raised below, which is that MRIs are too good at seeing blemishes on the brain, and the risk is that somebody will be told there's something fuzzy on the MRI, and I don't know what it is, and may require follow-up. Also the dye that she used and just the exposure. The contrast, the dye. Sure. I mean, any medical procedure is going to have some level of risk, but we're not bringing a case to force people to get any particular procedure. What was done in the, we settled with one of the defendants, and the procedure was that they would get a stipend and were required to consult with their doctor, and they could have whatever follow-up treatment their doctor. If there should be a decision that there is no effective follow-up, what are you gaining? If monitoring won't help against this peril, what is the gain? What is the point of the action? Well, I can only speak for myself and put it in those terms. If I knew I had five years to live instead of what I expect, I would live my life differently, and that would be a meaningful benefit to me. So the fact that brain cancer is not curable, I don't think reduces the benefit to knowing whether or not you have it. Some people might not want to know. If it was me, I'd want to know, and I would think it would be a significant benefit to know or a significant relief to know that I had that clean bill of health. It's the reason women go for mammograms to check their health, although there's courses of treatment for breast cancer that aren't available for brain cancer. But there are still courses of treatment that can prolong brain cancer. So I would want to know, and I think that's a benefit. I'll give you a minute on the property class. Property class directly raises an issue that Your Honor wrote about in the Hoheider case. I don't know if I'm saying that right. I think that's right. Okay. As to whether or not a district court can properly consider certification of common issues and how this court will interpret the Castano decision, decisions following it. There we turned down a class certification. We reversed. There you did, yes, because the part of the class that was attempted to be carved out was itself not amenable to class treatment. I'm not an expert on ADA and Title VII, but the way the district court in that case had attempted to carve issues was to carve out some sort of preliminary showing that would establish a policy. So your position is that a property class is easier to deal with? And there are innumerable examples that we cite in our brief of property classes that have been certified for the exposure and causation issues. The other thing on the property class I think the district court got wrong as a matter of law was its interpretation of where the break has to be if you're going to try common issues. The district court, I think, was hung up on the notion of whether this is a liability issue as opposed to a damages issue and you have to bifurcate so that you can establish liability itself all the way through to establish liability and then just leave damages for a follow-up. And the district court cited this court's case in Newton where that was an issue, but it was an issue in the context of securities and antitrust analogies where impact goes to liability and where with millions of trades, for example, in Newton, you couldn't leave impact for follow-on proceedings because there's millions of trades. This case involves 400 or so houses. So if those people were able to aggregate the exposure issues, which don't raise any of the individual issues Your Honor talked about, about moving in and out of the town, the house is there the whole time. If the model shows the house is exposed presently or in the past, there's no question that the house was there when the exposure was there. Then the issue of was that level of exposure damaging to that property and how do you measure that damage? If there are 400 cases left at the end of the day, I think there are ways that the court could aggregate issues in even those cases. But if the worst case is those people who can't bring these claims for financial reasons now, get those claims and then go to court in Illinois with findings and present their issue of damages with a realtor, I think that's a procedure that gives them some measure of satisfaction that they have been denied so far. When you're talking about damages to the property, you aren't talking about actual damage to the physical structure. Are you talking about the fact that people are going to be reluctant to buy into that area? Aren't there all sorts of factors beyond what you have just discussed? The present situation, if the level of exposure is down, then the potential danger to buyers in the area doesn't exist. If it's simply a subjective psychological reaction, is that caused by the defendants? And it seems that there are a number of different issues in property damage that differ from medical damage but still are very complex and diverse to be determined.  The first issue, vinyl chloride, which is the chemical issue here, is at levels that we're talking about, odorless, it's colorless, so it can't be detected at the level that we're talking about. It may be able to be detected at certain levels. I don't know exactly what level detection starts and doesn't start. Our experts do, and that, I assume, is in the record. So, no, there's no – if you're standing in McCollum Lake Village today, you can't feel vinyl chloride around you. You can't see it. And there's been no structural damage to the houses? That's correct. All right. Then the issue is – there's an issue of is there contamination? And that issue can be addressed class-wide. And the contamination will vary from property to property, depending on how close they are to the plant and how far away they are. But the answer as to how much contamination reached the property in the past and how much is there presently can be modeled and presented in a class proceeding. I think – But then you're – so you obviously agree that each area is – will have a different exposure level. I mean, you've said that. So how does that then transfer into damages where we're really talking about a depreciation of property value? Do you think that can be modeled? No. The damages – the calculation of damages, depreciation, is an individual inquiry. And there's – I don't think there's any way to get around that. And we didn't present any evidence on that because we conceded at the district court level that we weren't asking to treat – to determine individual property damage on a class-wide basis. That would have to be done on a follow-on proceeding. It could be done – Well, so then we get into the whole efficiency argument. That's correct. And, well, of course, if it's B2, we don't worry about superiority and predominance. But under B3, we would. Right. Under the – and actually the efficiency argument is probably the more relevant argument where we're trying to certify certain issues rather than the whole thing because if you carve issues into common issues, you're almost ensuring predominance as to those issues. So the inquiry then has to be – and I think the elements were laid out a little bit in the Hoharder case, elements that you would look at when you're trying to balance efficiencies. Are you talking about property value as of the time the suit was brought? Are you talking about property value when in the past any homeowner there has sold a house? Are you talking about property value in the future? Exactly how do you define the property value? The property class is defined as present homeowners or people who own their home after 2006 when the fact of contamination became known. So for those homes, if I understand what you're getting at, for those homes where there's been a transfer of ownership, those owners would each share in the claim for that particular home and would have to apportion the claim among themselves whether it's amicable or not. But presumably the market would have been aware of the contamination after the cases were brought. Is there presently contamination? Yes, Your Honor, there is. And the district court – the defendants moved for summary judgment on the grounds that there was no present contamination. The district court denied that motion, which doesn't mean that there is present contamination, but means that the issue was considered by the court and evidence was presented. So it's a material issue of fact whether there is or not. That's correct. Good. Let me see. Is there anything else you want to add to that? No. You're coming back. I have a bottle of time, so I'll think about it and come back. Thank you, Mr. Ricciardi. Mr. Solano, we'll give you additional time. We'll put 25 minutes on. Good morning, Your Honors. May it please the Court, my name is Carl Solano and I represent the Roman Hawes defendants. Your Honors, let me just begin with a question asked earlier by Judge Roth about one of the issues in this case having to do with a common medical monitoring protocol. These are asymptomatic individuals. The evidence in the case is that there is no common medical monitoring protocol. As a matter of fact, the evidence is that applying the same medical monitoring procedure to each of these individuals would be unethical. I note that Judge Prater made those findings in her opinion. The plaintiffs have not even debated them in their brief. So on that issue, there is no commonality, and so that just takes one of the three points that Judge Prater focused on. The main discussion in Judge Prater's opinion had to do with exposure, exposure above background levels, and exposure above a risk level. It doesn't matter whether she looked at Dr. Ginsburg's evidence or she looked at Dr. Zanetti's evidence, they're both averages. And as Judge Prater pointed out, an average is an average, and it does not prove common exposure of everyone. Just to put the point aside, though, because Judge Prater looked at this record very carefully. She looked at Dr. Ginsburg's evidence because that's where plaintiffs told her to look. She asked the question at the hearing about, where do I go to find out what the exposure level is for all of these individuals? And they said, look at Dr. Ginsburg's number. That's the dose they're exposed to. That's a quote at page 3383 of the appendix. Plaintiffs said that Dr. Ginsburg would prove above average exposure. That's at page 3265. Dr. Ginsburg said he was presenting the evidence of above background exposure. That's at pages 3284 to 86. The court said that's what they focused on. So she looked at the right evidence, but, again, it doesn't matter. Whether you look at Dr. Ginsburg's number or you look at Dr. Zanetti's evidence, it's all averages. And averages don't tell us anything about how long any of these individuals lived in McCollum Lake Village over these 35 years. Did they live early? What years they lived in the village out of those 35 years. The evidence from Dr. Zanetti is that after the 1990s, the exposure and the levels in this village were below background. That's their evidence. So if they lived in the village in years after the 1990s, there was no above background exposure. It doesn't tell us anything about where they lived in the village and the exposure levels were different. Dr. Zanetti draws some lines on a map, but there are still variations. It doesn't tell us anything about how much time they spent during a day or when they left to go to work. This is a residential community. There are not a lot of businesses here. There are no schools in the community. How much time did the kids spend outside the village going to school? How much time was spent on vacations or whatever other activities? There was discussion during the hearing about Dr. Ginsburg's evidence really essentially meaning, presuming that a resident of the village is essentially sitting in a lawn chair outside their home in outdoor air for 35 years on average. Obviously people don't live that way. I think they disputed the lawn chair, but they didn't dispute basically that that's what this evidence is. This is evidence of averages, and it tells us nothing at all about individuals. And they admit this. Dr. Ginsburg said at the hearing real people would have exposure lower than his average. That's at page 3344. Plaintiffs say in their brief their average does not describe any one class member's exposure. That's at page 32. Plaintiffs also say an average concentration for a period of years does not prove the minimum concentration in any particular year. That's at page 36 of their brief. Now Mr. McYarty talked about, well, we can solve this problem by having findings made by the jury year by year. Judge Prater talked about that. She said it would be an administrative nightmare, and it doesn't prove anything. So maybe that proves what the average exposure in the village was in 1970, and again in 1975, and in any one of these other 35 years. It doesn't tell us anything about the individuals in the village, how many of those 35 years they were there, which of the 35 years they were there. It doesn't tell us where they were, and again it tells us nothing about vacations and work and school and all of those other issues. The risk to the individuals, would that vary by the period of actual time they spent in the village, not during one particular year, but during the entire 35-year period? Yes, Judge Roth, and that's why the plaintiffs define their class as anyone who lives there for at least a year, but it can be up to 35 years, and clearly your exposure under their theory is going to be higher if they lived there for 35 years than if they lived there for one. So certainly the duration of the time that they are there is going to make a difference, which years make a difference, all of those factors, and that's why there are all these variables, and that's why you cannot prove this by the common evidence that they presented. Your Honor, I'd like to turn to the property class. Plaintiffs conceded up front they cannot get certification of the entire property class, and so from the very beginning they started out with this slice and dice approach. Well, we're not going to try to certify the whole class. Let's just certify parts, some of the issues, and they defined it as liability versus damages. Did they start out that way, or was that in their reply? Well, they started out with an entirely different theory of class certification in the original brief. They redid their entire theory, Judge Rendell, in the reply brief, and I sort of say that's where they started because that's really where everything here starts. And so they said, let's do liability versus damages. And so Judge Prater said, okay, let's do liability versus damages. Let's take a look at what the liability issues are. Well, one liability is fact of harm. How do we know whether any of these individuals actually have a diminution in property value? One of the interesting things about this case is that they presented absolutely no evidence on the property class. There is absolutely no evidence in this case that any property has suffered a diminution in value, let alone all properties have. Take just one example of the problem. The property class is defined as anyone who owns property after April 2006. Well, Your Honor, we presented evidence, and it's at page 2078 of the appendix, that just between April 2006 and the end of 2007, there were 50, sales of 50 pieces of property in the village. That's something like one-eighth of all properties. Under their theory, anyone who bought property after April of 2006 benefited because the property values declined with knowledge about the supposed vital chloride affecting the properties. So you have one-eighth of the class members not having any damage whatsoever and actually benefiting under their theory. That's just one individualized issue having to do with harm, fact of harm. And they say, well, fact of harm, that sort of sounds like damages. Let's put that aside. Of course, fact of harm was the reason why this Court held in hydrogen peroxide and in Newton that individualized issues predominated, and so it's an important issue. But they say, let's put that aside. Let's talk about other liability issues. And Judge Prater said, okay, let's talk about causation. This is a claim for diminished property value. How many possible reasons can there be for any property to have dropped in value? We're talking mostly about houses. Maybe the roof needs to be repaired. Maybe they didn't remodel their kitchen. Maybe the property values have fallen for the same reason that most property values across the country have fallen in the last two years because there's just been a drop in the housing market. There's all sorts of causation problems, and that clearly is an individualized issue. And so they say, well, no, no, no, let's not talk about causation. Let's talk about exposure. And they say exposure is an easier issue for properties than it is for individuals. The issues are just the problems are the same. When was the property there? I mean, maybe if they want to talk about vacant lots, but we're not really talking about vacant lots. We're mostly talking about structures, homes. Properties were built during this period in different years. We presented evidence. It's in the record at pages 20, 36, and 37. There's a whole neighborhood in the southwest part of the village where the average home wasn't built until 1998. The undisputed evidence in the record is that by 1998, exposure was below background or levels were below background. Certainly that is an individualized issue. It would be possible, though, to get a real estate expert to compare this village versus somewhere else and say, you know, the general decline in the area was 10% in terms of value, but the way I appraise all of these because of the stigma, forget actual exposure, but, you know, someone coming in saying, why on earth would I buy in McComb Lake Village unless I'm getting such a good deal that I have to think, you know, I'm paying so little. And the real estate appraiser says it didn't decline 13% the way other values did, but indeed 25% so that you could say 12% attributable to the stigma, forget actual exposure, but just the perception of the buyer. Isn't that a possible, probable, common proof that could be offered that's different from medical monitoring? Judge Rendell, we put in evidence by a real estate appraiser who considered that very question. And what Mr. Roderick said was, no, you can't do it that way. Each property is individualized, and there are all sorts of factors that are going to make huge differences here, and you can't do it across the board. And Judge Rendell, that evidence was unrebutted by the plaintiffs, so that's the only evidence in the case on the question. The other thing about this evidence of exposure is, you know, they talk about exposure is that you just come in and you prove class-wide whether there was any exposure of the property. But eventually you're going to have to prove how much exposure. Again, this is an action for diminution of property value. Presumably, the greater exposure, the greater the damage. So what they're proposing essentially is that you have one jury look at the evidence one time to see whether there was any exposure at all, or whether there was exposure by background, presumably. But then you have to come back again later on and have another jury figure out how much exposure was there. And so you're having the same juries look at the same evidence, and Judge Prater said, there's no efficiency in that. It makes no sense whatsoever to do this, because it just doesn't help. And that brings us to the, Judge Sirica, I think we agreed it's Hoheider, the Hoheider factors. Judge Prater, in this court in Hoheider, at pages 200 and 201, this court identified the factors that a district judge should look at in considering whether the court should certify individual issues. And the court listed a bunch of them, and I invite the court to look at those factors and then to look at Judge Prater's opinion, because she analyzed the case in terms of those factors. The court said, you look at the complexity of the individualized issues that are left. Judge Prater, at page 56 of the appendix, in her opinion, said, looked at those and said, the individualized issues are so complex, it doesn't make any sense to certify the few common issues that are left. The court said, look at the efficiencies to be gained. Judge Prater, at that same page of her opinion, said, these remaining individualized issues, particularly amount of harm, amount of exposure, there's no efficiency here in doing this, because I have to revisit the same issue again. The court said, look at the constitutional implications of what you're doing. That's a Seventh Amendment problem. Judge Prater did that and said, I'm going to have to have two juries looking at the same evidence. That's not a good idea. The court said, look at potential preclusive effect on people such as those that are claiming water exposure that might be different. And Judge Prater said, yeah, there's a real problem there. This is not a case. I'm going to try to suggest that Judge Prater approached this case with some sort of idea that she could not certify issue classes. She didn't say that. She said, I need to be very careful about doing this. And, indeed, she does, because as this court has recognized, there's a tension between certifying just issue classes and the whole idea of predominance. At some point you end up certifying classes solely on the basis of commonality and writing predominance out of the rule. And that's not what the rule says. And so Judge Prater says, I need to be careful about this. I need to pay a lot of attention to this. I need to look at the management problems. And she did that. And when she was done, she concluded that, in the end, it made no sense to certify only these pieces of the class action, because what would be left would be so overwhelming that it would not be manageable. That was a proper exercise of Judge Prater's discretion. And there is no reason to disturb that. Your Honors, if there are no other questions, thank you. Okay. Good. Mr. Solano, thank you very much. Thank you. Mr. Ricciardi. Your Honors, I have three points on rebuttal. The first is this issue that Judge Prater in the district court made, findings on the property class as to efficiency, superiority, manageability. I believe a fair reading of her opinion is that she did not. For example, she discussed the issue of whether a second jury would implicate constitutional concerns but addressed that in passing. She addressed superiority but in the context of the case as a whole, meaning not just property but also the medical monitoring case. What she did in her superiority discussion was reference her earlier discussions on problems with medical monitoring and individual issues. She didn't make findings on the property class under the analysis in the Hoheider case. I would point your Honors to a case from another district court in this circuit. The case is Roe v. E.I. DuPont, Dena Moore's and Company. The decision is 262 FRD 451, came out in October 2009. It's another property exposure case. The opinion I cited to you is an opinion certifying, in part, some issues on some claims regarding exposure and liability. The opinion follows the same court's decision not to certify a medical monitoring class. The court handled both classes separately, made complete findings of fact as to each element in both medical monitoring and property. What you won't find in the district court's opinion in this case is a list of the elements on our various property claims, how each element is susceptible or not to common proof. You won't find any of the rigorous analysis that was asked for and demanded in the hydrogen peroxide case. Our position is that the denial of certification requires the same rigorous analysis that the grant of certification does. And that wasn't done for the property class. How does Roe help you? The Roe decision on the property class certified common issues for determination as to the property class. You're not relying on the medical monitoring aspect in Roe? Not in the result, obviously. I mean, it came down the other way. What common proof did you offer in the property damage? I was asking Mr. Solano about the real estate agent could testify as to the difference in the property. Did you offer common evidence of that kind? We didn't even characterize that as a common issue that we would present at a class trial of this issue. If you want to take an example of a trespass cause of action, did the defendant's conduct cause, in this case, a chemical to go onto plaintiff's property, and did that result in damage? Well, the defendant's conduct is a common course of conduct. It doesn't rely on any individual or any home. The exposure, whether that groundwater contamination and airborne contamination reached a particular property or home, is done in a class trial by modeling the exposure. The amount of the exposure that reached the home at various points in time and that reaches the home presently is a class issue that's testified to by a single expert who gives an opinion as to each house in the village. As to each house in the village. He gives an opinion as to the level of exposure across the village, which would apply to each house. And once you've done that, then, what is left for individual determinations afterwards? There would be one of two ways to handle the individual, or one of two issues left. One is the fact of damage. Does the amount of exposure that has been proven constitute damage to the property? But doesn't that necessitate looking at each house individually, seeing when they were built, are there other problems? It might. Make it attractive or not attractive. It might or it might not. I mean, there could be an issue. The facts may be different, but don't you have to look at each house individually? Yes, you do in the same way that you have to look at each house to see how much exposure got to that house. There may be common patterns of exposure that are susceptible to common or consolidated follow-on proceedings. The amount of damage, Judge Rendell's issue of the real estate appraiser, that's done on a home-by-home basis. But there's only 400 homes here, and they're grouped into neighborhoods. There may be ways to ask an expert to opine on the relative diminution in value for a particular group of 10 or 20 homes. It's not necessarily 400 separate proceedings. That's a worst-case scenario. But what we do know is the district court didn't even consider whether that was efficient or non-efficient, didn't consider the alternatives, which are whether the case could be brought in the absence of that type of procedure or not. My time is up. Thank you. Any other questions? Thank you, Mr. Ricciardi. The case was very well argued by both sides. A lot of complicated cases.